[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 520 
 ON REMAND FROM THE UNITED STATES SUPREME COURT
When first considering this appeal, this Court held that this defamation action was preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Reynolds Metals Co.v. Mays, 516 So.2d 517 (Ala. 1987). Mays petitioned the United States Supreme Court to issue a writ of certiorari to this Court. That Court granted the petition, vacated the judgment of this Court, and remanded the cause "for further consideration in light of Lingle v. Norge Division of Magic Chef, Inc.,486 U.S. 399 [, 108 S.Ct. 1877, 100 L.Ed.2d 410] (1988)." ___ U.S. ___, 108 S.Ct. 2814, 100 L.Ed.2d 915 (1988).
The question presented on remand is whether Mays's state-law defamation claim arising out of disciplinary action taken against him by his employer, Reynolds, "is 'independent' of the collective-bargaining agreement [between Reynolds and the union to which Mays belonged] in the sense of 'independent' that matters for § 301 preemption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement." Lingle, 486 U.S. at ___,108 S.Ct. at 1882, 100 L.Ed.2d at 420 (footnote omitted). TheLingle Court also rephrased the test by saying: "as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." Id., 486 U.S. at ___,108 S.Ct. at 1883, 100 L.Ed.2d at 421 (footnote omitted).
At 2:35 a.m. on March 14, 1984, while Mays was on duty at Reynolds's plant in Sheffield, Alabama, an arsonist set fire to a foreman's office at the plant. Reynolds's investigation led it to suspect Mays, W.G., and D.G. Mays alleges in his complaint that Reynolds defamed him. Three alleged publications are pertinent to this appeal: oral statements by Reynolds's investigator Raymond Graham to Mays's co-worker Gary Holcombe; a telegram to Mays on March 16 suspending him "for the purpose of continued investigation regarding arson occurring at the plant" and notifying him that he was scheduled to take a polygraph test; and another telegram on March 21 converting his suspension to termination. A jury awarded Mays $150,000 compensatory and $500,000 punitive damages, and the trial court entered judgment on the verdict.
The provision of the collective-bargaining agreement ("the Agreement") that Reynolds cites in its argument for preemption is Article XVIII, "Termination or Layoff":
 "The Company has the right to discharge or lay off any employee for sufficient and reasonable cause, including, without being limited to, insubordination, inefficiency, or failure to comply with reasonable posted general plant rules. Such employee, and a representative of the Union, shall upon request be advised promptly in writing by the Company of the reason or reasons for such discharge or layoff. The employee shall have the right to appeal in accordance with the grievance procedure in Article XIX.
 "Should it be found upon investigation as provided in Article XIX that an employee has been unjustly discharged or laid off, such employee shall be immediately reinstated in his former position, with full rights restored, and shall be compensated for all time lost less any amounts he received from other sources or such other disposition as may be determined."
The grievance procedures of Article XIX mentioned in Article XVIII are not pertinent to this appeal. *Page 521 
Reynolds argues that the oral communication came in the course of its investigation into whether it had "sufficient and reasonable cause" to discharge Mays and that the telegrams were written notice of the reasons for the suspension and the discharge. With regard to the provision that the employee is to be notified in writing "upon request," Reynolds asserts that its standard practice is to notify an employee in writing of disciplinary action, whether the employee requests such notice or not, and that this practice has become incorporated into the Agreement. Thus, concludes Reynolds, it was acting under a good faith interpretation of its rights and duties under the Agreement and thus, it argues, this state-law defamation action is preempted because, it says, the terms of the Agreement must be interpreted to resolve Mays's claims.
Reynolds asserts that Lingle merely disapproved a test for preemption applied by some courts, that of inquiring whether the same facts would be dispositive of the tort claim and of a grievance under the collective bargaining agreement. Reynolds argues further that the remand of this case does not compel this Court to reach a different conclusion, but that, in fact, this Court applied the correct standard on initial consideration, that of inquiring whether the tort claim is "inextricably intertwined with consideration of the terms of the labor contract," 516 So.2d at 519, quoting Allis-ChalmersCorp. v. Lueck, 471 U.S. 202, 213, 105 S.Ct. 1904, 1912,85 L.Ed.2d 206 (1985), and "whether Mays's claim is sufficiently independent of the collective-bargaining agreement to withstand the preemptive force of Section 301," 516 So.2d at 519, citingInternational Bhd. of Elec. Workers, AFL-CIO v. Hechler,481 U.S. 851, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987).
Mays counters by arguing that a correct reading ofLingle, Lueck, and Hechler leads to the conclusion that a state-law tort action is barred only if it is "substantially dependent" on interpretation of a collective bargaining agreement, citing, e.g., Lingle's reference (at n. 10) toCaterpillar Inc. v. Williams, 482 U.S. 386, 107 S.Ct. 2425,96 L.Ed.2d 318 (1987). As part of Mays's argument for the conclusion that his claim is not substantially dependent upon an interpretation of the Agreement, he points out that Reynolds did not raise any defense at trial regarding the Agreement, but first raised the issue of preemption on appeal. See516 So.2d at 518. Indeed, the Agreement is not a part of the record, but is before us only in an "addendum" to Reynolds's original brief on appeal. Normally, such an exhibit and an argument based thereon would not be considered on appeal, but, because the United States Supreme Court has held that the issue of preemption is one of jurisdiction, it can be raised at any time. See 516 So.2d at 518, citing International Longshoremen'sAss'n, AFL-CIO v. Davis, 476 U.S. 380, 106 S.Ct. 1904,90 L.Ed.2d 389 (1986). Although the preemptive effect of the Agreement is presented for review, there is at least some plausibility to Mays's argument that the failure to raise the Agreement at trial indicates that this action is independent of the Agreement.
To resolve this dispute, we turn to a consideration of the facts of the three principal cases on point, Lingle, Hechler, and Lueck.
Lueck, the earliest of the three cases, involved an action under Wisconsin law based on an alleged bad faith handling of an insurance claim. The insurance coverage was a benefit of the collective-bargaining agreement, however, and the agreement provided procedures for presentation and processing of claims. The Court held that the bad faith action was preempted because the duty of good faith arose by implication from the collective-bargaining agreement and because "The parties' agreement as to the manner in which a benefit claim would be handled [would] necessarily be relevant to any allegation that the claim was handled in a dilatory manner." 471 U.S. at 218,105 S.Ct. at 1914; see Lingle, 486 U.S. at ___,108 S.Ct. at 1881.
Hechler filed an action against her union for failing to provide a safe place for her to work. The Court held that the action was *Page 522 
preempted, observing that the union had no common-law duty to provide a safe place to work, and that, thus, any such duty could arise only from the collective-bargaining agreement. Therefore, the tort claim was not sufficiently independent of the collective bargaining agreement to withstand the pre-emptive force of § 301. See Hechler, 481 U.S. at 859-62,107 S.Ct. at 2167-68; Lingle, 486 U.S. at ___,108 S.Ct. at 1881, n. 4.
In Lingle, the state-law claim was a retaliatory discharge claim alleging that Lingle had been fired for filing a workers' compensation claim. The collective-bargaining agreement prohibited discharge without just cause, but the Supreme Court held that the action was not preempted, because the "purely factual questions pertain[ing] to the conduct of the employee and the conduct and motivation of the employer" and to the employer's defense "that it had a nonretaliatory reason for the discharge" did "not turn on the meaning of any provision of a collective-bargaining agreement." 486 U.S. at ___,108 S.Ct. at 1882.
It seems clear that this case is much more likeLingle than like Lueck or Hechler. Indeed, on initial consideration, this Court had some doubts whether the latter two cases compelled a finding of preemption, but, because they represented the dispositive law on the subject and seemed to indicate an expansive application of preemption, this Court opted for the result that seemed most consistent with the United States Supreme Court's holdings. It appears that theLingle Court shifted its analysis from the "inextricably intertwined" test to the "interpreting the agreement" test and thereby restricted the application of preemption.
None of the issues in this defamation action requires interpretation of the Agreement. Even conceding Reynolds's argument that, through practice, written notice had become required even if the employee did not request it, the Agreement gives no indication of what sort of notice is proper and permissible. All of the questions at trial and in this appeal come straight from the law of defamation.
A succinct definition of libel, found in McGraw v. Thomason,265 Ala. 635, 639, 93 So.2d 741, 744 (1957), indicates the principal elements of a cause of action for defamation:
 "Generally, any false and malicious publication, when expressed in printing or writing, or by signs or pictures, is a libel, which charges an offense punishable by indictment, or which tends to bring an individual into public hatred, contempt, or ridicule, or charges an act odious and disgraceful in society."
An oral publication of such matter constitutes a slander, but the differences between the causes of action for slander and for libel are not material here.
Two matters in defense of such an action and the fact question of malice form the principal issues in this appeal. The first question involves the principle that certain communications among corporate employees do not constitute a publication by the corporation; see Wilson v. Southern MedicalAss'n, 547 So.2d 510 (Ala. 1989); Nelson v. Lapeyrouse GrainCorp., 534 So.2d 1085 (Ala. 1988); K-Mart Corp. v. Pendergrass,494 So.2d 600 (Ala. 1986); and Dixon v. Economy Co.,477 So.2d 353 (Ala. 1985). The second question is whether the alleged publications were privileged under the principles of such cases as Cousins v. T.G. Y. Stores Co., 514 So.2d 904 (Ala. 1987); Kirby v. Williamson Oil Co., 510 So.2d 176 (1987);Tidwell v. Winn-Dixie, Inc., 502 So.2d 747 (Ala. 1987); andFulton v. Advertiser Co., 388 So.2d 533 (Ala. 1980) cert. denied, 449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). Finally, Reynolds argues that there was insufficient evidence of malice to overcome the privilege and that the trial court's instructions erroneously confused the pertinent principles of common-law malice and the principles of "actual malice" as defined in New York Times Co. v. Sullivan, 376 U.S. 254,84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which are not pertinent here (see Cousins, supra). *Page 523 
Thus, the questions presented do not require construing the Agreement: Were the oral statements to Holcombe properly within the scope of the duties of the respective Reynolds employees so as not to constitute a publication or so as to be privileged? Were the communications to Western Union employees privileged? If these were publications that were privileged, did Reynolds act with common-law malice and thereby lose the protection of the privilege?
The only one of these questions that even arguably requires interpretation of the Agreement is the one concerning the respective duties of Graham and Holcombe. That question is argued by reference to the operative facts and to the general law of defamation and of employer and employee, however; no provision regarding Reynolds's right to investigate crimes on its property is included in the Agreement, nor is there any provision therein specifying the duties of the various employees. Certainly nothing in this case would establish any principles of interpretation of collective-bargaining agreements that would affect the uniformity of federal labor-law principles.
In sum, as the Supreme Court said in Lingle, "Each of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer. Neither of the elements requires a court to interpret any term of a collective-bargaining agreement." 486 U.S. at ___,108 S.Ct. at 1882. Thus, the defamation claim is independent of the Agreement and is not preempted by § 301. See, also, Nelson v.Lapeyrouse Grain Corp., 534 So.2d 1085 (Ala. 1988), in which, on the authority of Lingle, this Court reached the same result in a very similar case.
This holding that the action is not preempted requires us to consider the appeal on the merits. We shall first address the question of whether the statement to Gary Holcombe constituted an actionable defamation.
Holcombe was a furnace operator with the same duties as Mays, that is, tapping or pouring the molten metal from the furnace wells as they became full. From his work station, he could see out of the furnace building, which was known as the "cast house," to the area between the office that was burned and the gasoline pumps from which a hose was run to the office. Holcombe was on duty on the morning of the fire, and he saw both Mays and D.G. during the course of his shift. In fact, he saw D.G. dragging a hose from the direction of the office toward the pumps about an hour before the fire, although he did not tell Graham about this until later. He saw Mays immediately after the fire; Mays had failed to respond to two pages shortly before the fire and, when Holcombe saw him after the fire, Mays asked how many times he had been paged.
On Thursday night, March 15, Holcombe went to the plant to pick up his paycheck. Reynolds employees told him he could not have his check until he talked to their investigator, Graham. Holcombe talked to Graham, who said that Reynolds thought that Mays, D.G., and W.G. had participated in setting the fire. Graham then asked Holcombe what he had done and what he had seen on the night of the fire, and specifically asked Holcombe if and when he had seen Mays, D.G., and W.G.
These facts clearly establish that both employees owed a duty to their employer, Reynolds, in regard to the communication made the subject of this action: Graham had a duty to elicit information from Holcombe regarding what Holcombe had seen in connection with the fire, and Holcombe had a duty to tell Graham what he had seen. Strictly speaking, Graham may not have had a duty to tell Holcombe that he suspected D.G., Mays, and W.G., but, having formed that suspicion, Graham could ask questions about the three. We decline to draw so fine a line as to what constitutes internal corporate discussion and what does not as to say that Graham could ask Holcombe about the three suspects but could not identify them as suspects.
An action for slander or libel will lie only if the defendant publishes defamatory matter about the plaintiff to a third party. *Page 524 Walter v. Bromberg Co., 514 So.2d 1010 (Ala. 1987).
This Court has adopted the rule that there is no publication by a corporation in the case of a communication by one corporate employee to another corporate employee, in the course of transacting the corporation's business and in the line of their duty as employees of the corporation, about a fellow corporate employee. Nelson v. Lapeyrouse Grain Corp., supra;K-Mart Corp. v. Pendergrass, 494 So.2d 600 (Ala. 1986); Dixonv. Economy Co., 477 So.2d 353 (Ala. 1985); Burney v. SouthernRy., 276 Ala. 637, 165 So.2d 726 (1964); McDaniel v. CrescentMotors, Inc., 249 Ala. 330, 31 So.2d 343 (1947).
 "As long as a communication to a non-managerial employee falls within the proper scope of that employee's knowledge or duties, the McDaniel/Burney rule applies to non-managerial employees as well as to managerial employees. A corporation can act only through its servants, agents, or employees, Home Indem. Co. v. Anders, 459 So.2d 836 (Ala. 1984), and when officers and employees of a corporation act within the scope of their employment and within the line of their duties, they are not third persons vis-à-vis the corporation."
Nelson v. Lapeyrouse, 534 So.2d at 1093.
Nelson involved statements similar to those here, i.e., from a managerial employee to a non-managerial employee, Taylor, working in the same position as Nelson, who was suspected of stealing from Lapeyrouse. The Court held that "it is reasonable to conclude that he might have had important information to disclose," and that "By taking part in the investigation, Taylor acted within the scope of his employment and within the line of his duties." Id., at 1094. As we have shown, Graham had good reason to expect relevant information from Holcombe, and Holcombe had a duty to Reynolds to supply what information he had. There is no showing that either employee stepped outside of his proper duties. Thus, the communication to Holcombe did not constitute a publication and could not support an action for slander.
We next address the issues regarding the two telegrams. The test for the existence of a conditional privilege traces toBerry v. City of New York Ins. Co., 210 Ala. 369, 371,98 So. 290, 292 (1923):
 " 'Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged, if made in good faith and without actual malice. * * * The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken.' 25 Cyc. pp. 385, 386; [other citations omitted]."
See Nelson v. Lapeyrouse, supra, at 1094; Webster v. Byrd,494 So.2d 31, 36 (Ala. 1986); Willis v. Demopolis Nursing Home,Inc., 336 So.2d 1117, 1120 (Ala. 1976).
Whether a statement is protected by a conditional privilege is a question of law for the court. Nelson, supra; Webster,supra; Willis, supra; Fulton v. Advertiser Co., 388 So.2d 533
(Ala. 1980), cert. denied, 449 U.S. 1131, 101 S.Ct. 954,67 L.Ed.2d 119 (1981); and O'Barr v. Feist, 292 Ala. 440,296 So.2d 152 (1974).
In Nelson v. Lapeyrouse, supra, and in Montgomery v. Big B,Inc., 460 So.2d 1286 (Ala. 1984), the Court held that communications made to polygraph operators in the course of investigating suspected thefts were privileged. Mays concedes that the communications to the telegraph operators fall within the same rule. Reynolds contends that it was acting under at least a good faith belief, see Berry, supra, that it had a duty to give Mays written notice of his suspension and his polygraph test and, later, his termination. In at least the first instance, the need for speed arguably made appropriate the less private but faster means of the telegram instead of regular mail: on Monday, March 19, arrangements *Page 525 
were made for the polygraphs to be taken on Tuesday, March 20. The plant manager and personnel director decided to give Mays written notice of his suspension and the polygraph test, and the telegram was the only feasible means of giving written notice of the polygraph test. The owner of the telegraph office in Florence testified that, although he remembered the first telegram mentioning arson, he did not tell anyone, and that he had instructed his employees not to divulge the contents of telegrams and had posted a sign to that effect. Thus, the telegraph operators had a duty to transmit messages without publicizing them, and this, when considered with Reynolds's duty to investigate the arson and its right to take action against its employees deemed responsible, shows that the requirements for a conditional privilege are met.
Thus, the dispositive question is whether the question of malice, necessary to overcome the conditional privilege, was properly submitted to the jury. We note at this juncture that our analysis has already led to the conclusion that the judgment is due to be reversed because the trial court submitted to the jury the publication of the alleged defamation by Graham to Holcombe. The trial court erred in denying Reynolds's motion for directed verdict on this aspect of the claim, which was based on the ground that there was no publication. The court also instructed the jury, over Reynolds's objection, that no conditional privilege attached to the communication because it was made to a non-managerial employee.
The question of malice must be addressed, however, because it applies to the issues of whether the trial court properly instructed the jury on the standard for determining whether the privilege attaching to the telegrams had been lost and of whether Mays presented any evidence of malice so as to justify submitting the case to the jury at all. If Reynolds's arguments on the latter point are correct, a judgment is due to be rendered in its favor; and if not, the former issue will affect any retrial.
This Court has recently noted:
 "The 'actual or common law' malice that must be shown by private-figure plaintiffs to overcome a qualified or conditional privilege is to be distinguished from the 'actual malice' required in cases of the defamation of public figures and set forth in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). See Fulton v. Advertiser Co., 388 So.2d 533 (Ala. 1980)."
Cousins v. T.G. Y. Stores Co., 514 So.2d 904, 906 (Ala. 1987), n. 1. The Court in Cousins also noted that Dun Bradstreet, Inc. v. Greenmoss Builders, 472 U.S. 749,105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), indicated that the First Amendment does not prohibit private-figure plaintiffs from recovering punitive damages even in the absence of proof of Sullivan
"actual malice." Cousins, supra, at 907, n. 3.
The trial court repeatedly instructed the jury that theSullivan "actual malice" standard was the test for whether Mays could recover damages for any statement that was conditionally privileged; for example:
 "Plaintiff must prove to your satisfaction from the evidence the following things:
". . . .
 "(4) that the employee of the Defendant Reynolds Metals Company who made the defamatory statement knew at the time said statement was made that it was false and that it was defamatory or in making said statement acted with reckless disregard as to whether the statement was true or false, or in making said statement acted negligently in failing to ascertain whether the statement was false."
We note that negligence is not an element of theSullivan test. See, e.g., White v. Mobile Press Register, Inc.,514 So.2d 902 (Ala. 1987). The court also instructed the jury that "actual malice is synonymous with knowledge of falsity or reckless disregard of truth or falsity."
The standard of malice pertinent to the questions of conditional privilege and punitive damages in private-figure defamation cases is that *Page 526 
 "Such malice, actual or express, may be shown by evidence of previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of the defendant's language, the mode and extent of publication, and the like."
Kenney v. Gurley, 208 Ala. 623, 626, 95 So. 34, 37 (1923). SeeNelson v. Lapeyrouse, supra; Cousins v. T.G. Y., supra;Webster v. Byrd, 494 So.2d 31 (Ala. 1986); Cole v. Cooper,437 So.2d 1257 (Ala. 1983); Dent v. Smith, 414 So.2d 77 (Ala. 1982); Fulton v. Advertiser Co., 388 So.2d 533 (Ala. 1980), cert. denied, 449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119
(1981); Willis v. Demopolis Nursing Home, Inc., 336 So.2d 1117
(Ala. 1976); Interstate Electric Co. v. Daniel, 227 Ala. 609,151 So. 463 (1933).
Thus, the trial court improperly combined the two tests. Moreover, its instructions would have allowed the jury to find that Reynolds lost the protection of the privilege if it was merely negligent in not determining that Mays had in fact committed the arson. Negligence is not an element of either malice test, and such an instruction virtually, if not completely, eliminates the privilege.
Finally, Reynolds argues that the trial court should have granted its motion for directed verdict or its motion for J.N. O.V. because, it says, Mays did not present any evidence that the sending of the telegrams was the product of malice. The following facts are pertinent to this argument:
Prior to the fire, Mays had had several reprimands for such things as allowing his furnace to overflow and breaking a window by building a fire in a large pot inside the cast house. Mays filed at least one grievance proceeding regarding these reprimands, arguing that he was given harsher punishment than other employees doing similar things. Both parties point to this evidence as reflecting on the other's motive: Mays says that Reynolds's treatment of him shows malice, and Reynolds says that Mays was disgruntled and had a motive for destroying his files, which were in the office that was burned.
Immediately after the fire, Phillip Tays, who was the cast house foreman and whose office was the one burned, and J.B. Haney, who was the plant security officer, came to the scene and took tape-recorded statements from the employees on duty regarding their whereabouts before, during, and after the fire. Two employees said they had seen Mays outside the cast house, and another said he had not seen Mays in the control room in which Mays said he had been at the time of the fire. However, Mays presented evidence casting doubt on the reliability of the two identifications and on whether they took place near the time of the fire. Further, the employee who said he had not seen Mays in the control room said further that he might have just not noticed him.
Mays was pouring man on the number one furnace on the night of the fire. The number one furnace was nearest the doors outside of which the fire took place. Mays testified, and the loading documents verified, that he finished a tap about 1:00 a.m. He said that he then went to the Number 1 2 control room for a few minutes, after which he went to the doorway and watched the fog roll in; one of the employees who said she saw Mays leaving the cast house may have seen him at this time. He said that he then went to the Number 4 control room, where he stayed from shortly before 2:00 until shortly before 3:00, when he heard a page for him to come tap his furnace. Mays said that, after he had been in the Number 4 control room for a few minutes, William Bankhead, another employee, came in and stayed until Mays left. Reggie Cole was charging the Number 4 furnace, and he said that as he drove his forklift past the Number 4 control room, he saw Mays inside it. Nate Mason also looked into the Number 4 control room and spoke to Bankhead.
Mays gave this version of events to Tays and Haney when they interviewed him after the fire. Tays and Haney did not ask Mason or Cole about Mays when they interviewed them, but Bankhead did tell them *Page 527 
that Mays had been in the Number 4 control room. Of course, with the fire having been set at about 2:30 or 2:35, Mays's statement that he had been in the Number 4 control room from 2:00 until after the fire was contrary to any claim that he had committed the arson.
Graham arrived at the Reynolds facility later on the day of the fire and began his investigation the next day. He interviewed Mays on Thursday, March 15, and Mays testified that he told Graham that he had been in the Number 4 control room from some time before 2:00 until he responded to a page shortly before 3:00, and that Bankhead had been in there with him from about 2:00 until Mays left to tap his furnace. Graham asked Mays if he would take a polygraph exam, and Mays agreed to do so. Mays continued in his testimony by saying, "And I asked him what would happen if I failed this polygraph and he told me I'd better find me a damn good lawyer."
Mays took the polygraph exam the following Tuesday, with his lawyer present. The polygraph operator reported to Reynolds that Mays gave answers normally indicative of deception when he answered "no" to the following four questions:
 "1. Did you attach the rubber tubing to the gas pump nozzle? 2. Do you know who set the fire in Phil Tays' office? 3. Did you participate in putting gas in Phil Tays' office? 4. Did you break the window in Phil Tays' office?"
The operator reported that Mays did not give a deceptive answer when he answered "no" to the question "Did you set the fire in Phil Tays' office?"
Reynolds's management personnel had a meeting that Friday afternoon, at which Graham reported that Mays and D.G. had "failed" the polygraph examination and that W.G. had "passed" it. The senior managers did not listen to the tapes of the interviews that Tays and Haney had conducted on the morning of the fire; they assert that they relied on Graham's recommendations. W.G. was reinstated, and Mays and D.G. were terminated.
Mays's principal arguments that he presented evidence of malice center on the history of his treatment at the plant and on the alleged inadequacy of the investigation. While we concede Reynolds's point that the evidence of malice was scant, this case was tried under the scintilla rule, and we cannot say that the evidence was entirely insufficient to submit the case to the jury on the question of whether Reynolds abused the protection of the privilege when it sent the telegrams accusing Mays of arson. Therefore, although the judgment is due to be reversed because of the submission of the claim regarding Graham's statement to Holcomb and because of the erroneous instructions on malice, the cause is due to be remanded for a new trial.
REVERSED AND REMANDED.
All of the Justices concur.