Terry K. LANGSTON, a minor who sues By and Through his mother and next friend, Patricia LANGSTON, Plaintiff–Appellant,

v.

ACT a/k/a/ American College Testing Program; Ann York, Vice President of Operations Division of ACT; Dr. Richard Ferguson, Executive Vice President of ACT; Peg Dana, Assistant Vice President ACT Assessment Program, Services, Defendants–Appellees.

No. 88–7719.

United States Court of Appeals, Eleventh Circuit.

Dec. 13, 1989.

Hugh A. Locke, Jr., Locke & Locke, Birmingham, Ala., for plaintiff-appellant.

Sally P. Paxton, Fulbright & Jaworski, Carl W. Vogt, Robert A. Burgoyne, Washington, D.C., for defendants-appellees.

N. Lee Cooper, Maynard, Cooper, Frierson & Gale, P.C., Birmingham, Ala., for ACT, Dick Ferguson, Ann York, Peg Dana.

Before JOHNSON and
EDMONDSON, Circuit Judges, and
PECKHAM *, Senior District Judge.

JOHNSON, Circuit Judge:

This case arises on appeal from the district court's grant of summary judgment in favor of the defendant American College Testing Program ("ACT") on August 12, 1988.

## I. FACTS

### A. Background

Terry Langston ("plaintiff") was an outstanding football player at Gardendale High School in Gardendale, Alabama. He was heavily recruited by many colleges, including the University of Alabama. As part of the college admissions process, plaintiff took the ACT test, a multiple choice college entrance exam that is required for admission to many colleges. The registration booklet for the ACT test contained the following provision:

> ACT reserves the right to cancel any test score if it finds reason to believe that the score is invalid due to testing irregularities or student misconduct. When student misconduct may have led to invalid scores, ACT routinely conducts an inquiry. If a student's scores are questioned, the student is informed of the options, including procedures for appeal, that are available.

In June of 1986, plaintiff received a composite score of ten on a scale of one to thirty-five. This score was inadequate to qualify him to play Division I football under National Collegiate Athletic Association ("NCAA") rule Proposition 48. Six months later, in December of 1986, plaintiff retook the test and received a composite score of twenty. This score was adequate to qualify him to play Division I football, and he accepted a scholarship to attend the University of Alabama. By June of 1987 he had enrolled at Alabama and was attending football practice.

ACT's computers automatically flag the test results of any applicant whose score increases by more than 6 points during a twenty-month period. Because plaintiff's score had increased by ten points in 6 months, ACT's computers automatically flagged his test results for further investigation on December 23, 1986. In late January 1987, ACT began an internal audit of plaintiff's December test results.[1]

This audit indicated that plaintiff's December results were inconsistent with the results that would be expected for an examinee with plaintiff's self-reported high school grades. ACT therefore went on to compare plaintiff's individual answers on the exam with the answers of those examinees who were sitting near him. ACT relied on the numerical sequencing of the test booklets to determine who was sitting near the plaintiff.[2] Plaintiff's test number was 413620. By reviewing the answers on the tests around the plaintiff, ACT found an unusual similarity between plaintiff's answers and the answers on test number 413619.

Plaintiff's test and test number 413619 had 189 identical responses out of a total of 219 answers on the test. The two tests had identical wrong answers to 70 questions.[3] At this point ACT determined that

---

* Honorable Robert F. Peckham, Senior U.S. District Judge for the Northern District of California, sitting by designation.

1. The internal audit is conducted without the examinee's knowledge. ACT security personnel examine all of the test scores on file for the examinee, the answer sheets, registration documents, seating diagrams (there was no seating diagram in this case), and any other informa-

tion that is on file. ACT also examines the examinee's "self-reported" grades and the handwriting on the tests.

2. ACT instructs all of its proctors to hand out tests sequentially.

3. ACT compared the number of identical answers between plaintiff's test and test number 413619 to the number of identical answers be-

there was reason to question plaintiff's December 1986 results and, on February 19, 1987, ACT wrote to plaintiff informing him that ACT wished to further investigate his December score.

The letter informed plaintiff of the three reasons why ACT questioned his score: (1) the large jump in performance from June 1986 to December 1986, (2) the discrepancy between the December score of 20 and the expected score for someone with his grade point average, and (3) the similarity between his test answers and those of an examinee sitting near him. The letter presented plaintiff with three options:

Option 1: If you have information that you believe would establish the validity of your 12/86 test scores, ... please provide that information in writing along with any official documentation (e.g., high school transcripts, other test scores, documentation from school officials) to substantiate that information.

Option 2: Retest to confirm your 12/86 scores without additional charge under special arrangement with ACT. If the results from this retest confirm your 12/86 scores, both the 12/86 and the retest scores will remain on file, and no further action will be taken. If the retest scores do not confirm your 12/86 scores, the 12/86 scores will be cancelled and the retest scores will be entered in ACT's records. Your college and scholarship agency choices will be informed that the 12/86 scores should be cancelled.[4]

Option 3: Cancel the 12/86 scores and receive a refund of the basic test fee....

The letter also informed Plaintiff of his right to appeal any action taken by ACT as a result of the investigation through arbitration.

Plaintiff took the first alternative. He wrote to ACT denying any wrongdoing and he supplied ACT with several letters written on his behalf. A letter from the exam proctor stated that while the proctor could not swear that no cheating took place at the December exam, he found it very difficult to believe that anyone cheated. Officials from plaintiff's high school also wrote letters on his behalf.[5] The school officials wrote ACT explaining that plaintiff was not motivated to do well on the first test. They explained that in the fall plaintiff realized that his chances of going to college and playing football hinged on his performing well on the test and in school and that since that time plaintiff's grades had improved to the point where they were "quite satisfactory." The officials also stated that plaintiff had done satisfactorily on another standardized test.

At this point, ACT asked to see plaintiff's high school transcript. Plaintiff refused to supply it. Plaintiff's lawyer wrote to ACT that a review of the transcript would "cause interminable delay and exhaustive evidence without relevance." ACT then presented plaintiff with three options: (1) retest at ACT's expense, (2) cancel the scores and receive a refund, or (3) arbitrate. Plaintiff's attorney wrote ACT rejecting both the retest and arbitration, and demanding certification of the December score.[6]

On June 1, and again on June 10, 1987, ACT wrote plaintiff's attorney explaining that ACT was cancelling the December score. On June 10, ACT also wrote plaintiff's high school explaining to them that the December score was cancelled and instructing the high school to destroy all copies of the scores. Despite the June 10 cancellation of plaintiff's scores by ACT, plaintiff went on to register at Alabama. Apparently, Alabama did not know about the cancellation when the university accept-

---

tween other pairs of examinees who had similar scores to plaintiff's. Other pairs had an average of 103 identical answers and less than 18 identical incorrect answers.

**4.** ACT later modified this position by indicating to plaintiff's attorney that if the retest was "within a couple of points" of his December scores, then ACT would confirm them.

**5.** Plaintiff's guidance counselor, his principal, his coach, and two of his teachers wrote on plaintiff's behalf.

**6.** On September 1, 1987, plaintiff's attorney wrote ACT requesting arbitration. ACT refused, citing plaintiff's earlier rejection of that option.

ed plaintiff and relied on the December scores, which his high school had attached to his transcript. When Alabama called ACT to confirm the scores on August 18, 1987, ACT refused to comment. Alabama then declared plaintiff ineligible to play football pursuant to NCAA Proposition 48. Plaintiff did not leave Alabama, but continued to attend classes.

### B. *Proceedings in the District Court*

On September 16, 1987, plaintiff sued ACT for breach of contract, for outrageous conduct causing severe emotional distress, and for denial of due process under 42 U.S.C.A. § 1983. Plaintiff later amended the complaint to add libel and slander claims. The complaint asked the district court for a preliminary injunction directing ACT to reinstate his December score. Plaintiff's motion for a preliminary injunction was denied on September 28, 1987. ACT filed a motion for summary judgment along with supporting affidavits on December 15, 1987.

On August 12, 1988, the district court granted summary judgment to ACT on all counts. The district court found that there was no state action to support a claim under section 1983 or under the Fourteenth Amendment. It found that no material issue existed as to whether ACT's actions were so outrageous in character or extreme in degree that they constituted intentional or reckless infliction of emotional distress. The court held that plaintiff's libel and slander claims were untenable because ACT and the high school had a qualified privilege to communicate information regarding the scores and because plaintiff first published the investigation to authorities at his high school.

The district court also granted summary judgment on plaintiff's breach of contract claim. It held that the plain language of the ACT registration booklet reserved to ACT the right to cancel a score in the face of wrongdoing. Under Alabama contract

law, the court ruled, the most that ACT was required to show was a good faith basis for its cancellation of the score. The court found no genuine issue of fact concerning the reasonableness of ACT's actions.

## II. DISCUSSION

### A. *Standard of Review*

In this appeal we consider the district court's grant of summary judgment on plaintiff's constitutional and state law claims. We also consider plaintiff's challenge to the district court's March 29, 1988 discovery order. This Court's review of a grant of summary judgment is plenary. This court must ask whether there is any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Shipes v. Hanover Ins. Co.*, 884 F.2d 1357, 1359 (11th Cir.1989); Fed.R.Civ.P. 56. All evidence and inferences therefrom should be viewed in the light most favorable to plaintiff as the nonmoving party. *Golden v. Mobil Oil Corp.*, 882 F.2d 490, 493 (11th Cir.1989). While the movant bears the initial burden of production in demonstrating that there is no genuine issue of material fact, the nonmoving party has the burden of making a showing sufficient to establish the existence of each element essential to the nonmovant's case on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Plaintiff argues that the district court erred in taking into account the preponderance of the evidence standard when it considered ACT's motion for summary judgment. Under *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), a district judge ruling on a summary judgment motion must take into account the standard of proof that a party will bear at trial. *Id.* at 252, 106 S.Ct. at 2512.[7] In this action, the

---

7. Plaintiff argues that *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), is limited in its application to cases involving the clear and convincing evidence standard of proof. The *Anderson* Court stated, however, that "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment.... [t]he judge's inquiry ... unavoidably

plaintiff would be required to prove his case by a preponderance of the evidence at trial. The district court, therefore, did not err in taking into account plaintiff's burden of proof.

### B. *Due Process*

■ Plaintiff sues under 42 U.S.C.A. § 1983, claiming that ACT violated his Fourteenth Amendment right to due process. The Fourteenth Amendment does not apply to private parties unless those parties are engaged in activities deemed to be "state action." *NBC v. Communications Workers of America,* 860 F.2d 1022, 1024 (11th Cir.1988).

■ Plaintiff argues that by using state facilities such as plaintiff's high school and Jefferson State College, where plaintiff took the ACT exam, to give tests, to advertise, to record scores on students' records, and to cancel scores, ACT has become a state actor for purposes of section 1983. Plaintiff also maintains that the University of Alabama has made ACT a state actor by requiring the ACT test for admission.

Few courts have considered the question of whether a national standardized testing company like ACT is a state actor for purposes of the Fourteenth Amendment and section 1983. The First Circuit has rejected the argument. *See Johnson v. Educational Testing Service,* 754 F.2d 20, 24 (1st Cir.), *cert. denied* 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985). The courts have been fairly restrictive on the broader issue of when private acts constitute state action. In *NBC,* 860 F.2d at 1025,[8] this Court outlined the criteria for determining when a private person's acts constitute state action:

'[i]f a thread of commonality is to be drawn from the various forms in which state action can manifest itself through the conduct of private parties, it is that

attribution is not fair when bottomed solely on a generalized relation with the state. Rather, private conduct is fairly attributable only when the state has some affirmative role, albeit one of encouragement short of compulsion, in the particular conduct underlying a claimant's civil rights grievance.' ... While specifically the [Supreme Court has spoken] of holding the state liable pursuant to state action doctrine, the standard remains constant when a party seeks to hold a private actor liable under the state action doctrine.

*Id.* at n. 4 (citations omitted).

The *NBC* Court distilled three tests for state action from Supreme Court precedent: (1) the public function test, (2) the state compulsion test, and (3) the nexus/joint-action test. *Id.* at 1026. The public function test is narrow, covering private actors who perform functions that are traditionally the *exclusive* prerogative of the state. *Id.* The Supreme Court has emphasized that a mere showing that a private person performs a public function is not enough to establish state action. *See Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982) (holding that the education of maladjusted children, while a public function, is not the exclusive prerogative of the state); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974) (rejecting rule that businesses "affected with the public interest" are state actors); *NCAA v. Tarkanian,* —— U.S. ——, 109 S.Ct. 454, 465, 102 L.Ed.2d 469 (1988) (even if a private monopolist is so powerful that it can effectively impose its will on a state agency, it does not follow that the monopolist is a state actor). The University of Alabama and a large number of other institutions, both public and private, rely on ACT to evaluate students for admissions. ACT's taking on this public

---

asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* at 252, 106 S.Ct. at 2512.

**8.** In *NBC v. Communications Workers of America,* 860 F.2d 1022 (11th Cir.1988), NBC argued that the Communications Workers of America

engaged in state action when they prohibited NBC from attending their convention in the Miami Civic Center because the lease afforded the city of Miami a degree of control and supervision over the convention. The Court rejected NBC's argument.

function, however, does not make ACT a state actor under the public function test.

The state compulsion test asks whether the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the private actor's choice must be deemed to be that of the state. *NBC*, 860 F.2d at 1025 (citing *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 546, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987)). In *San Francisco Arts & Athletics*, the Supreme Court held that where Congress passed a statute giving the U.S. Olympic Committee ("the USOC") the exclusive right to license use of the word "olympic" for the purpose of helping the USOC raise funds, the USOC was not a state actor. *San Francisco Arts & Athletics*, 483 U.S. at 543, 107 S.Ct. at 2984. The Supreme Court relied on the finding that the USOC's choice of how to enforce its right was not the government's decision and that, at most, the government "acquiesced" in the USOC's choice. Mere approval or acquiescence in the private actor's choice is not enough. *Id.* at 547, 107 S.Ct. at 2986. In *NBC*, this Court relied on the fact that the city of Miami did not enter into the decisionmaking process that resulted in the exclusion of NBC. *NBC*, 860 F.2d at 1026; *see also Blum v. Yaretsky*, 457 U.S. 991, 1005, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (the fact that the state responds to a private actor's decisions by withdrawing state benefits does not convert the private actor's decisions into state action). In the instant case, ACT developed its own system for ensuring the reliability of student test scores. The reliance of state institutions on the validity of test results is not enough to convert ACT's security measures into state action under the state compulsion test.

Under the nexus/joint-action test, the Court asks whether the state has inter-twined itself with the private actor to such an extent that the state was a joint participant in the enterprise. *NBC*, at 1026–27. In *San Francisco Arts & Athletics*, the Supreme Court rejected the plaintiff's claim under this test because it had "failed to demonstrate that the Federal Government can or does exert any influence over the exercise of the USOC's enforcement decisions." *San Francisco Arts & Athletics*, 483 U.S. at 547 n. 29, 107 S.Ct. at 2986 n. 29. In the present case, plaintiff has failed to show that the University of Alabama, or any other agency of a state, has exerted influence over ACT's security decisions. Plaintiff does not meet the requirements of the nexus/joint-action test or any of the other tests for state action, and therefore ACT is entitled to judgment as a matter of law on plaintiff's section 1983 claims.

### C. Contract Claims

 The district court relied on *Johnson v. Educational Testing Service*, 754 F.2d 20 (1st Cir.), *cert. denied* 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985), to determine that ACT's contractual obligation to plaintiff was merely to act in good faith. The *Johnson* court relied on Massachusetts contracts law in determining the defendant's contractual duties. *Johnson*, 754 F.2d at 26. Under *Erie Ry. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this Court must apply Alabama law to plaintiff's contract claims. Under Alabama law, however, the parties to a contract have a similar duty to perform their contractual obligations in good faith. *Brown Marx Assoc., Ltd. v. Emigrant Savings Bank*, 527 F.Supp. 277, 280 (N.D. Ala.1981), *aff'd* 703 F.2d 1361, 1367 n. 5 (11th Cir.1983); Ala.Code § 7-1-203 (1984).[9]

The registration materials provided to plaintiff included a provision reserving to

---

**9.** Plaintiff argues vigorously that the question of whether or not he cheated is the issue in this case. It is the substantive law of the case, however, that identifies which issues of fact are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Under the governing law, the outcome of plaintiff's case does not turn on whether or not plaintiff cheated on his exam, but only on whether or not ACT carried out its contractual obligations in good faith.

ACT the right to cancel scores in which it did not have confidence. These materials are provided to students well in advance of the test. The cancellation provision appears on a page entitled "Information You'll Need After You've Registered." This provision empowered ACT to cancel scores if it had a good faith doubt as to the validity of plaintiff's scores.[10]

Based on the undisputed facts in this case, there is no genuine issue as to whether ACT breached its obligation to act in good faith under the contract. ACT's investigation of plaintiff's scores was extensive. ACT considered the dramatic increase in plaintiff's scores, the alarming similarity between plaintiff's answers and those of test number 413619, plaintiff's self-reported grades, and the letters that plaintiff forwarded to ACT. ACT expressed a desire to consider plaintiff's transcript and any retest that plaintiff might take, but plaintiff refused to comply with ACT's requests for this information. Finally, ACT offered the plaintiff the option of arbitration several times. Plaintiff's attorney responded that plaintiff had no faith in arbitration and simply demanded that ACT certify the December score.

Plaintiff's position, by comparison, appears to have been unreasonable. To demand that ACT prove by eyewitness testimony that an individual cheated before invalidating a score would undermine ACT's primary function of providing colleges with scores that are highly reliable. ACT could not possibly catch every student who cheats on its exams if it had to produce an eye witness to confirm every instance of misconduct.

ACT's actions in this case are consistent with the actions of the Educational Testing Service ("ETS") in *Johnson v. Educational Testing Service*, 754 F.2d 20 (1st Cir.1985). In *Johnson*, the plaintiff took the Law School Admissions Test ("LSAT") three times, receiving scores of 317, 323, and 623 on a 200 to 800 scale. ETS had a handwrit-

ing expert compare the writing samples from the plaintiff's three test forms. When the expert concluded that the third test was not written by the same person who wrote the first two, ETS notified the plaintiff that ETS doubted the validity of the scores and presented her with three alternatives: (1) retaking the test at no charge, (2) cancelling the score (3) submitting further information, and (4) doing nothing, in which case ETS would cancel the score. *Id.* at 22. The plaintiff submitted affidavits and letters testifying to her good character and indicating that she took a prep course between the second and third exams. The plaintiff also submitted the opinion of her own handwriting expert that all three tests were written by the same person. ETS asked the plaintiff to retest and promised that if the new score was within 50 points (or possibly up to 100) of her old score, then ETS would validate the old score. Plaintiff refused, and ETS invalidated the score. *Id.* at 22–23.

The plaintiff sued ETS on constitutional, contractual, and tort grounds. The trial court granted ETS summary judgment on the entire complaint. After concluding that ETS was not a state actor, *Id.* at 25, the First Circuit determined that the plaintiff's contract claims were also invalid because ETS had acted in good faith.

> We think it sufficient to note that ETS sought the services of three separate handwriting experts after the University of Pennsylvania questioned the 300 point discrepancy in Johnson's scores; that ETS provided Johnson with an opportunity to be heard and to be represented by counsel; and that ETS offered Johnson, without charge, the option of a retest in which she would take the same April 1971 examination that resulted in the 623 score. These and other factors indicate that ETS went beyond the letter of its contractual promise.

---

**10.** Under Alabama law, the interpretation of contracts is a question of law to be determined by the trial judge. *Upton v. Mississippi Valley Title Ins. Co.*, 469 So.2d 548, 553–54 (1985). In this Court, such conclusions of law by the district court are subject to *de novo* review. *Kirkland v. Nat'l Mortgage Network, Inc.*, 884 F.2d 1367, 1370 (11th Cir.1989).

*Id.* at 26.[11]

In the present case, because ACT engaged in an extensive investigation, offered the plaintiff a retest, and offered the plaintiff the opportunity to arbitrate, ACT's actions meet the requirements of reasonableness and good faith.

### D. *Libel and Slander*

■ The district court held that there was no genuine issue of material fact on the libel and slander claims because the only people with whom ACT communicated concerning the investigation were officials at Gardendale High School, all of whom either had a qualified privilege to the information or first learned of the investigation from the plaintiff. Plaintiff argues that while ACT had a qualified privilege to communicate the scores, it had no privilege to communicate concerning an investigation.[12]

In *Montgomery v. Big B, Inc.*, 460 So.2d 1286, 1287–88 (Ala.1984), the Alabama Supreme Court held that a statement is privileged and cannot be the subject of a defamation action where a party makes the statement pursuant to a duty owed either to the public or to a third party, or where the statement is one in which the speaker and the third party have corresponding interests. Only if there is malice can the plaintiff recover. *Id.* at 1287–88 (citing *Berry v. City of New York Ins. Co.*, 210 Ala. 369, 371, 98 So. 290 (1923)); *Reynolds Metals Co. v. Mays*, 547 So.2d 518, 524 (Ala.1989). Whether the speaker is privileged is a question of law for the trial judge to resolve. *Montgomery*, 460 So.2d at 1288; *Reynolds Metals*, 547 So.2d 524.

In this case, there is no evidence that ACT wrote to anyone outside of plaintiff, plaintiff's guidance counselor, and plaintiff's attorney regarding the investigation. The guidance counselor was responsible for posting ACT test scores on student's transcripts and forwarding them to colleges. Thus, she falls within the privilege. The principal and other teachers that wrote on plaintiff's behalf were attempting to validate plaintiff's score and, therefore, they fit within the privilege. Thus, ACT is entitled to summary judgment on plaintiff's libel and slander claims.

### E. *Outrageous Conduct*

■ In order to make out a case of outrageous conduct in Alabama, plaintiff must show "extreme and outrageous conduct" that is intentional or reckless and causes severe emotional distress or bodily harm. *Goodwin v. Barry Miller Chevrolet, Inc.*, 543 So.2d 1171, 1174 (Ala.1989). The conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in civilized society." *American Road Serv. Co. v. Inmon*, 394 So.2d 361, 365 (Ala.1981).

Plaintiff has not produced any evidence raising a genuine issue that ACT's conduct was outside the bounds of decency and utterly intolerable in a civilized society. *See id.* On the contrary, ACT made a concerted effort to come to a just resolution of plaintiff's case. ACT offered plaintiff a free retest, the opportunity to

---

**11.** ETS included in the registration materials a provision reserving the right to cancel any score if in the opinion of ETS there was adequate reason to question its validity. *Johnson v. Educational Testing Service*, 754 F.2d 20, 26 (1st Cir.), *cert. denied*, 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985).

**12.** Plaintiff also claims that ACT's request for his transcript violated 20 U.S.C.A. § 1232g(b)(1), which prohibits educational institutions that receive funds from the federal government from disclosing a student's record without the written consent of the student's parents. Most courts that have considered the question have held that no private right of action can be implied from this statute. *See, e.g., Klein Ind. Sch. Dist. v.*

*Mattox*, 830 F.2d 576 (5th Cir.1987) (indicating no private cause of action for release of transcript); *Girardier v. Webster College*, 563 F.2d 1267, 1277 (8th Cir.1977) (enforcement lies solely in the Secretary of Health, Education and Welfare); *but see Fay v. So. Colonie Cntr. Sch. Dist.*, 802 F.2d 21, 33 (2d Cir.1986) (no private cause of action, but a plaintiff may bring a section 1983 suit on the basis of the federal interest created by the statute). In the present case, ACT is not an "educational institution" within the meaning of 20 U.S.C.A. § 1232g(a)(3). Plaintiff has not alleged that ACT receives any federal funds, that ACT sought to release his transcript, or that ACT is a school.

present evidence supporting his score, and the opportunity to arbitrate the matter. Plaintiff argues that ACT's failure to validate his score based on the letters that he produced constituted outrageous conduct. These facts also form the basis of plaintiff's reasonableness argument. ACT's actions, however, were neither outrageous nor unreasonable given the strength of the evidence before ACT. Thus ACT is entitled to summary judgment on the intentional and reckless infliction of emotional distress claims.

### F. *District Court's Limitations On Discovery*

 Finally, plaintiff challenges the district court's discovery order of March 29, 1988. In reviewing a district court's discovery order, this Court must consider whether the judge abused his discretion. *Borden, Inc. v. Florida East Coast Ry. Co.*, 772 F.2d 750, 756–57 (11th Cir.1985). Plaintiff moved to compel answers to certain interrogatories on December 21, 1987. The interrogatories asked for "algorithms and methods used by ACT to determine whether or not Langston cheated on the ACT exam," and the name of the student from whom plaintiff allegedly cheated. ACT refused to turn over the technical information because it was a trade secret and refused to turn over the student's name because of its contractual obligation to that person not to divulge his or her identity. On March 29, 1988, the trial court ordered ACT to provide the plaintiff "at least the raw data" considered by ACT in its statistical analysis of plaintiff's test.

Plaintiff now argues that by refusing his motion to compel an answer on the methods used by ACT, the trial court abused its discretion. It is not clear how the March 29, 1988 order harmed plaintiff. ACT supplied plaintiff's expert with the raw data underlying its conclusion, and the affidavit of ACT's expert spells out in detail the methodology that the expert used in reaching his conclusion. Moreover, the affidavit of plaintiff's second expert complains only of the failure by ACT to provide information on how much students taking the exam for the second time improve their score from their first exam. Thus the district court's order did not hinder plaintiff's efforts to build his case, *see* Fed.R.Civ.P. 26 committee notes ("the court must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case"), and the district court did not abuse its discretion. *See Borden*, 772 F.2d at 756–57.

### III. CONCLUSION

We AFFIRM the district court's grant of summary judgment on the plaintiff's section 1983 claim, breach of contract claim, and tort claims, and we AFFIRM the district court's discovery rulings.

AFFIRMED.