[No. 58161-4.   En Banc.   November 5, 1992.]

ERNEST COMMODORE, *Appellant*, v. UNIVERSITY MECHANICAL CONTRACTORS, INC., ET AL, *Respondents*.

*Hugh Hafer, David Hannah,* and *Hafer, Price, Rinehart & Robblee,* for appellant.

*Lisa L. Pan* and *Hallmark, Keating & Abbott, P.C.,* for respondents.

DOLLIVER, J. — Plaintiff Ernest Commodore seeks review of the trial court's dismissal of his claims for defamation, outrage, racial discrimination, and tortious interference with a business relationship or expectancy. The court granted summary judgment for defendants and dismissed plaintiff's claims on the ground they were preempted by federal law.

■ When reviewing an order of summary judgment, this court engages in the same inquiry as the trial court. A summary judgment motion can be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The court must consider the facts in the light most favorable to the nonmoving party and the motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion. *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990).

Commodore is a steam fitter and member of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local 32 (Local 32). On June 5, 1989, Commodore began work for defendant University Mechanical Contractors, Inc. (University) as a welder. University and Local 32 are parties to a collective bargaining agreement (CBA). During his tenure, Commodore worked on a job University performed for Boeing. Defendant Bernard C. Spencer was employed by University as a superintendent on the Boeing job.

On August 18, 1989, University terminated Commodore's employment. The reason given was a "reduction in force", but Spencer later testified Commodore was not capable of making "quality welds". No complaints concerning the quality of Commodore's work, attitude, or attendance had ever been issued. In fact, his termination slip, which was signed by the project's general foreman, said, "[t]hank [*sic*] for a good job."

Commodore returned to employment with University on the Boeing job on December 12, 1989. Spencer testified he

agreed to take Commodore back as a pipe fitter. The business manager of Local 32 asked Spencer to employ Commodore as a welder, and Spencer complied, but testified he soon found Commodore's work unsatisfactory and transferred him back to pipe fitting. Commodore testified it was during this period he began experiencing a pattern of harassment from Spencer, including Spencer's calling Commodore a "god-damned nigger". According to Spencer, Commodore was unhappy with being a pipe fitter and complained constantly. Commodore was terminated from employment again on January 29, 1990.

Commodore was rehired and dispatched to the Boeing jobsite again on April 2, 1990, as a pipe fitter. Commodore maintains Spencer's harassment of him escalated. Spencer contends Commodore had a "bad attitude" and his work was substandard.

On May 17, 1990, Commodore was late for work. He had called to explain he would be late, and when he arrived, declined to sign a warning notice regarding his tardiness. Commodore testified he and his co-workers had been advised by union representatives not to sign warning slips. Spencer was angry at his refusal and called him an idiot, claiming, "I am going to get you." According to Commodore, later that day Spencer and two other workers on the site taunted him, pointing and laughing. Commodore quit his job the next day, May 18, 1990.

Commodore later went to work for Wright, Schuchart & Harbor (WSH) at a separate jobsite. Commodore and union steward Charles Gilmore testified Spencer made repeated visits to the jobsite and harassed Commodore, calling him "ratchet-neck" and "clown", and encouraging Commodore's fellow employees to do the same. In addition, Spencer told the WSH general foreman, "I fired him. . . . You should watch him. You will get rid of him too." The foreman testified he paid little attention because "[he] knew that Spencer [didn't] like blacks." WSH management eventually ordered Spencer not to return to the jobsite.

The business manager of Local 32 was aware of Commodore's situation, but found no basis for grieving his claims under the CBA. Instead, he suggested Commodore file a lawsuit.

Commodore filed suit in King County Superior Court against University and Spencer on February 19, 1991. The complaint alleged defamation, outrage, tortious interference with a business relationship, and (in the amended version) racial discrimination. Without filing an answer, University and Spencer moved to dismiss on grounds each of Commodore's claims was preempted by the exclusive jurisdiction of the National Labor Relations Board (NLRB) and/or breach of CBA preemption under section 301 of the Labor Management Relations Act, 1947 (LMRA). *See* Labor Management Relations Act, 1947, ch. 120, § 301, 61 Stat. 156 (codified at 29 U.S.C. § 185) (hereinafter referred to as section 301). The trial court declined to address the jurisdiction of the NLRB, but found all of Commodore's claims preempted under section 301 and granted summary judgment in favor of defendants, dismissing the case. This appeal followed.

The conflict in this case arises from Commodore's attempt to obtain relief for grievances based on rights provided by state law. University has raised as a blanket defense the supremacy of federal labor law which limits the parties to the remedies provided in the CBA and asserts this issue is controlled by the labor law preemption doctrine arising under section 301 of the LMRA. Section 301 is the first of three branches of preemption under federal labor law. The second, known as the *Garmon* doctrine, establishes the primary jurisdiction of the National Labor Relations Board as arbiter of disputes resulting from efforts by the State to regulate conduct that is arguably either prohibited or protected by the National Labor Relations Act of 1947. *See San Diego Bldg. Trades Coun. v. Garmon*, 359 U.S. 236, 3 L. Ed. 2d 775, 79 S. Ct. 773 (1959). The third, or *Machinists* branch, preempts any attempt by the State to regulate activity that

Congress did not prohibit or protect but intentionally left unregulated. *See Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Empl. Relations Comm'n*, 427 U.S. 132, 49 L. Ed. 2d 396, 96 S. Ct. 2548 (1976). The parties agree only section 301 preemption is at issue here. Section 301(a) gives the federal courts jurisdiction over lawsuits arising from CBA's:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

In *Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448, 1 L. Ed. 2d 972, 77 S. Ct. 912 (1957), the Supreme Court concluded Congress intended section 301 to give federal courts authority to enforce CBA's and ruled section 301 authorized courts to develop a federal common law of CBA interpretation. The Supreme Court first decided whether section 301 preempts state law in a case arising in Washington, *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 7 L. Ed. 2d 593, 82 S. Ct. 571 (1962). *Lucas Flour* held state courts could not apply local contract law to enforce CBA's. In affirming the result the Washington Supreme Court reached, the United States Supreme Court nevertheless ruled "[t]he dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute." *Lucas Flour*, 369 U. S. at 103. The Washington court should therefore have applied federal contract law to resolve the dispute.

Taken together, *Lincoln Mills* and *Lucas Flour* state this rule: Section 301 authorizes courts to establish a federal common law for interpreting CBA's, and states cannot use local rules to resolve breach of CBA disputes. A different issue arises, however, when a plaintiff brings a claim that does not sound in breach of contract, but nevertheless arguably implicates the CBA. *See* Note, *The Need for a New*

*Approach to Federal Preemption of Union Members' State Law Claims*, 99 Yale L.J. 209, 215 (1989-1990) (hereinafter Marcus).

In 1985, the Supreme Court first confronted the effect of section 301 on a *tort* claim, holding section 301 preempted a Wisconsin union employee's state law cause of action for a bad faith handling of an insurance claim. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 85 L. Ed. 2d 206, 105 S. Ct. 1904 (1985). Although Wisconsin recognized a tort for the bad faith handling of an insurance claim, the Court found employees like Lueck who were covered by a CBA could not seek redress under the state law. The CBA itself was the source of the right to insurance benefits and of the duty to act in good faith in making payments. *Allis-Chalmers*, 471 U.S. at 217. Whether any breach of the duty occurred would therefore involve interpretation of the CBA's terms to determine whether Allis-Chalmers had acted reasonably in performing its contractual duties. *Allis-Chalmers*, 471 U.S. at 218. Because the tort claim was "inextricably intertwined" with the CBA, it was preempted. *Allis-Chalmers*, 471 U.S. at 213.

Following *Allis-Chalmers*, the Supreme Court decided *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877 (1988), which is still the prevailing standard for judging section 301 cases. In *Lingle*, the Court decided an Illinois state law retaliatory discharge claim was not preempted by section 301, despite the employee's coverage by a CBA with a "just cause for discharge" provision.

Illinois provides a common law cause of action for an employee discharged in retaliation for filing a workers' compensation claim. The plaintiff, Jonna Lingle, was discharged for filing an allegedly false workers' compensation claim. She brought a grievance for her discharge under the CBA, and an arbitrator ordered her reinstated with back pay. Concurrently, however, she filed an action in state court for retaliatory discharge. *Lingle*, 486 U.S. at 402.

The case was removed to federal court on diversity grounds and dismissed by the District Court which concluded the retaliatory discharge action was "inextricably intertwined" with the CBA's just cause provision. *Lingle,* 486 U.S. at 402 (citing *Lingle v. Norge Div. of Magic Chef, Inc.,* 618 F. Supp. 1448, 1449 (S.D. Ill. 1985)). The Seventh Circuit affirmed, holding the claim was preempted because " 'the same analysis of the facts' " was involved in both the CBA action and the state law claim. *Lingle,* 486 U.S. at 402 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.,* 823 F.2d 1031, 1046 (7th Cir. 1987)).

■ The Supreme Court reversed. It found the state law claim independent of the contract claim

> in the sense of "independent" that matters for § 301 preemption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement.

(Footnote omitted.) *Lingle,* 486 U.S. at 407. While the same facts the arbitrator had examined *would* be analyzed by a court, no term of the CBA needed to be interpreted to resolve Lingle's state law claim. Rather, the factual inquiry as to whether Lingle was terminated to keep her from exercising her statutory rights or whether the employer had another (nonretaliatory) reason for the discharge would "not turn on the meaning of any provision of a collective-bargaining agreement." *Lingle,* 486 U.S. at 407. Thus, the Court held, the claim was not preempted. At the conclusion of its opinion, the Court reiterated the current test for section 301 preemption:

> [W]e hold that an application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective-bargaining agreement.

(Footnote omitted.) *Lingle,* 486 U.S. at 413.

*Lingle* establishes a rule for determining whether state law claims of employees governed by a CBA are preempted under section 301 but gives little guidance as to what constitutes a state-provided right. As a result, courts are still

struggling to ascertain when a claim's resolution actually *will* involve interpretation or consideration of the CBA, and section 301 cases are still far from uniform or consistent, varying widely in their holdings, even after *Lingle*.

Two divergent "models" for using the *Lingle* test have been proposed. The first (White model) argues "negotiable" claims, *i.e.*, those waivable in contracts, should *always* be preempted because their resolution will necessarily depend upon interpretation of a CBA, while "nonnegotiable" rights should *only* be preempted when their resolution depends upon interpretation of any express or implied term of the CBA. White, *Section 301's Preemption of State Law Claims: A Model for Analysis*, 41 Ala. L. Rev. 377, 417, 425-26 (1989-1990) (White). Negotiable claims may be waived or altered by private agreement and generally deal with individual, as opposed to public, rights. Nonnegotiable state law claims are narrowly tailored, usually statutory remedies designed to protect the public good or to provide a fixed minimum substantive guaranty. Under this definition, the vast majority of common law claims would be negotiable, having no statutory policy base and providing no fixed minimum substantive right. Further, such claims would protect the individual as opposed to the public good. White, 41 Ala. L. Rev. at 417 n.175 (citing Yonover, *Preemption of State Tort Remedies for Wrongful Discharge in the Aftermath of* Lingle v. Norge: *Wholly Independent or Inextricably Intertwined?*, 34 S.D.L. Rev. 63, 94 (1989)).

The second (Marcus model) rejects the notion that preemption depends solely or even chiefly on negotiability, and instead focuses on whether a state law claim is "independent". A state statutory or common law claim is independent of the CBA — and therefore should not be preempted by section 301 — if it could be asserted *without* reliance on an employment contract. Marcus, 99 Yale L.J. at 225. Courts would therefore declare section 301 preemption only in the following causes of action: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing (for

example, plaintiff Lueck's claim in *Allis-Chalmers*), and (3) claims that are clearly based *directly* on violation of the CBA (for example, if plaintiff's sole support for the outrage claim is an allegation that defendant breached the CBA). Marcus, 99 Yale L.J. at 225-26.

An alternative formulation of the Marcus model is this: If nonunion employees can maintain a cause of action under a state statute or under common law without reference to an employment contract, then union employees should be afforded the same opportunity, *i.e.*, their state law claims should not be preempted. Marcus, 99 Yale L.J. at 226. Marcus notes:

> In passing section 301, Congress did not intend to give union workers fewer rights than non-union workers. If an employer could eliminate a union member's right to bring a state law action simply by asserting a defense requiring CBA interpretation, employees would see unionization as a less desirable alternative.

(Footnote omitted.) Marcus, 99 Yale L.J. at 229 (citing *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756, 85 L. Ed. 2d 728, 105 S. Ct. 2380 (1985) ("It would turn the policy that animated the Wagner Act [National Labor Relations Act of 1947] on its head to understand it to have penalized workers who have chosen to join a union by preventing them from benefiting from state labor regulations imposing minimal standards on nonunion employers.")).

Marcus points out an independent right can be negotiable or nonnegotiable. She also notes a negotiable state law right is independent if it does not arise from the CBA and only the employer's *defense* mandates interpreting the CBA. (In this situation, Marcus proposes allowing the state court to assess the employer's defense under its concurrent jurisdiction to interpret CBA's. *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 7 L. Ed. 2d 483, 82 S. Ct. 519 (1962). The state court must apply federal law in its interpretation of the CBA, but after evaluating the validity of the employer's defense, the court could use independent state law standards to resolve the employee's state law claim. Marcus, 99

Yale L.J. at 227.) The Marcus model also classifies non-negotiable state law rights — those that cannot be waived in contract — as independent of CBA's by definition: They *cannot* be altered by CBA negotiations. Marcus concludes section 301 should not preempt nonnegotiable *or* independent negotiable claims. Marcus, 99 Yale L.J. at 210 n.13.

An examination of both models convinces us the second, or Marcus model, is the better approach. In our opinion, the White model broadens the scope of section 301 by preempting state law claims more frequently than intended in *Lingle*. Moreover, the White model appears to emanate from a footnote in which the *Lingle* court stated:

> While it may be true that most state laws that are not pre-empted by § 301 will grant nonnegotiable rights that are shared by all state workers, we note that neither condition ensures nonpre-emption. It is conceivable that a State could create a remedy that, although nonnegotiable, nonetheless turned on the interpretation of a collective-bargaining agreement for its application. Such a remedy would be pre-empted by § 301. Similarly, if a law applied to all state workers but required, at least in certain instances, collective-bargaining agreement interpretation, the application of the law in those instances would be pre-empted. Conversely, a law could cover only unionized workers but remain unpre-empted if no collective-bargaining agreement interpretation was needed to resolve claims brought thereunder.

*Lingle*, 486 U.S. at 407 n.7. This rather cryptic footnote, which is dicta, gives no examples to illustrate the foregoing "conceivable" situations. We are at a loss to explain or apply such rules, other than on a fact-specific, case-by-case basis. Indeed, we are unable to fashion a practicable, systematic method of evaluating state law claims under the White model.

■ The Marcus model, on the other hand, is both workable and true to the language and holding of *Lingle*. Moreover, it takes into account and serves section 301 policy considerations, *e.g.*, the application of uniform (federal) law and the maintenance of certainty in the negotiation, administration, and enforcement of CBA's. *Lucas Flour Co.*, 396 U.S. at 104. Even where the state law claim is not preempted but the employer's defense implicates terms of the CBA, courts

of this state can apply federal law to assess the defense, thereby allowing "doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Lucas Flour Co.*, 369 U.S. at 104. Likewise, the Marcus test provides the desired certainty to parties to a CBA because it draws a bright line between those claims which are preempted and those which are not. For these reasons, we will evaluate Commodore's claims under cases applying *Lingle*, as well as under the Marcus model.

### RACIAL DISCRIMINATION

Commodore claims University and Spencer discriminated against him on the basis of race in violation of RCW 49.60-.180(3) and RCW 49.60.220. He asserts he was harassed and laid off due to his race. As RCW 49.60.180(3) states:

> It is an unfair practice for any employer:
>
> . . . .
> (3) To discriminate against any person in . . . terms or conditions of employment because of . . . race . . ..

RCW 49.60.220 states:

> It is an unfair practice for any person to aid, abet, encourage, or incite the commission of any unfair practice, or to attempt to obstruct or prevent any other person from complying with the provisions of this chapter or any order issued thereunder.

■ Commodore's claim for racial discrimination is based on the independent state law right codified at RCW 49.60 and could have been brought in the absence of a CBA. While we have not previously assigned labels of "negotiability" or "nonnegotiability" to causes of action in this state, we note racial discrimination is in the nature of a nonnegotiable claim. In any event, under the Marcus model, Commodore's claim for racial discrimination is not preempted.

Cases in which age, handicap, or religious discrimination was the state law claim at issue are in agreement. *See, e.g., Cook v. Lindsay Olive Growers*, 911 F.2d 233, 238 (9th Cir. 1990) (holding California statute establishes public policy against religious discrimination in workplace, and therefore

such a claim is not preempted); *Chmiel v. Beverly Wilshire Hotel Co.*, 873 F.2d 1283, 1286 (9th Cir. 1989) (holding California's age discrimination statute creates mandatory employment right independent of any CBA and therefore is not preempted under section 301); *Ackerman v. Western Elec. Co.*, 860 F.2d 1514, 1517 (9th Cir. 1988) (holding handicap discrimination claim defined and enforced under state law, not preempted by federal labor law).

Although the CBA states, "The contractors signatory to this agreement recognize their individual responsibility to develop and implement an equal opportunity and affirmative action program", it does not follow, as defendants claim, that an allegation of racial discrimination requires an interpretation of the CBA. Indeed, as the Court recognized in *Lingle*:

> The operation of [state] antidiscrimination laws . . . illustrate[s] the relevant point for § 301 pre-emption analysis that the mere fact that a broad contractual protection against discriminatory . . . discharge may provide a remedy for conduct that coincidentally violates state law does not make the existence or the contours of the state-law violation dependent upon the terms of the private contract.

*Lingle*, 486 U.S. at 412-13. We hold Commodore's claim for racial discrimination is not preempted by section 301.

### DEFAMATION

■ Commodore contends Spencer's comments to him, which others overheard, as well as his statements directly to other co-workers, were defamatory. In Washington, a defamation plaintiff must show four essential elements: falsity, an unprivileged communication, fault, and damages. *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981) (citing *Sims v. KIRO, Inc.*, 20 Wn. App. 229, 233, 580 P.2d 642, *review denied*, 91 Wn.2d 1007 (1978), *cert. denied*, 441 U.S. 945 (1979); Restatement (Second) of Torts § 558 (1977)), *cert. denied*, 457 U.S. 1124 (1982).

Defendants contend not only that all comments were made to "promote an efficient workplace and quality performance",

but also that such comments were privileged due to the interest of the recipient, specifically the WSH foreman.

█ Defendants' reliance on general provisions of the CBA does not persuade us preemption is required. Moreover, a cause of action for defamation exists independently of any CBA in the common law of Washington. In keeping with our adoption of the Marcus model, we find Commodore can pursue the defamation claim.

Several state and federal courts applying *Lingle* have reached the same conclusion. In *Reynolds Metals Co. v. Mays*, 547 So. 2d 518 (Ala. 1989), the Alabama Supreme Court found no section 301 preemption of a defamation claim, holding it was independent of the CBA. The court had previously found the defamation claim preempted, *Reynolds Metals Co. v. Mays*, 516 So. 2d 517 (Ala. 1987), but reversed after the United States Supreme Court vacated the judgment and remanded the case for reconsideration in light of *Lingle*. *Reynolds Metals Co. v. Mays*, 486 U.S. 1050, 100 L. Ed. 2d 915, 108 S. Ct. 2814 (1988). Reversing its earlier decision, the Alabama court said:

> It appears that the *Lingle* Court shifted its analysis from the "inextricably intertwined" test to the "interpreting the agreement" test and thereby restricted the application of preemption.
> None of the issues in this defamation action requires interpretation of the [CBA]. . . . All of the questions at trial and in this appeal come straight from the law of defamation.

*Reynolds Metals Co.*, 547 So. 2d at 522.

Other courts are in agreement. *See, e.g., Jackson v. Southern Cal. Gas Co.*, 881 F.2d 638, 645 (9th Cir. 1989) (reasoning "[o]ne can sue for defamation regardless of employment status or union membership") (citing *Tellez v. Pacific Gas & Elec. Co.*, 817 F.2d 536, 538 (9th Cir.), *cert. denied*, 484 U.S. 908 (1987)); *Thompson v. Public Serv. Co.*, 800 P.2d 1299, 1305 (Colo. 1990) (holding each element of defamation action may be resolved without interpretation of the CBA), *cert. denied*, 112 S. Ct. 452 (1991); *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1091 (Ala. 1988) (finding slander

claims arising from an investigation and a grievance hearing concerning suspected theft were not preempted because such claims were not "rooted in" the CBA but were independently actionable under state law); *Krasinski v. United Parcel Serv., Inc.*, 124 Ill. 2d 483, 492, 530 N.E.2d 468 (1988) (refusing to find preemption even where statement was made during investigation of events leading to employee's discharge, because "right to be free from malicious defamation . . . does not arise out of the rights negotiated in [a] labor contract, but out of State law.").

We recognize some courts have reached the opposite result, generally in the context of employee discipline. *See, e.g., Shane v. Greyhound Lines, Inc.*, 868 F.2d 1057, 1063 (9th Cir. 1989) (holding, because CBA required employer to notify union in writing of impending discipline, defamation claim was preempted); *Johnson v. Anheuser Busch, Inc.*, 876 F.2d 620, 624 (8th Cir. 1989) (holding statements made during investigation and grievance procedure in accordance with employers' right to control workplace were privileged and defamation claim was preempted). These cases do not persuade us the elements of defamation require resort to the CBA. *See Krasinski*, 124 Ill. 2d at 491. Not only is the alleged defamation in this case unrelated to an investigation or a grievance proceeding, it is also not contended the relevant statements were made pursuant to termination from employment. Moreover, even without a CBA Commodore could have brought his defamation claim. We hold the defamation claim is not preempted.

## OUTRAGE

■ We recently reiterated the basic elements of the tort of outrage. They are:

"(1) [E]xtreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." The conduct in question must be *"so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."*

(Citations omitted.) *Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989) (quoting *Rice v. Janovich*, 109 Wn.2d 48, 61, 742 P.2d 1230 (1987) and *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291, 77 A.L.R.3d 436 (1975)).

Defendants contend resolution of Commodore's claim for outrage requires an inquiry into the terms of the collective bargaining agreement. They argue outrage should be preempted because the outrageousness of their conduct depends on the scope of the allowable conduct under the terms of the CBA. Some courts concur, reasoning that because a prima facie case of this intentional tort requires a showing of extreme or outrageous conduct, the fact a CBA "authorizes" conduct alleged to be outrageous is some evidence of the reasonableness of the conduct. *McCormick v. AT&T Technologies, Inc.*, 934 F.2d 531, 536 (4th Cir. 1991), *cert. denied*, ___ U.S. ___, 116 L. Ed. 2d 813, 112 S. Ct. 912 (1992); *Douglas v. American Info. Technologies Corp.*, 877 F.2d 565, 571-72 (7th Cir. 1989).

■ Several courts, with whose reasoning we agree, have reached the opposite result. *See, e.g., Hanks v. General Motors Corp.*, 906 F.2d 341, 344 (8th Cir. 1990) (holding intentional infliction of emotional distress claim based on employee's reassignment to work with supervisor accused of molesting employee's daughter not preempted because claim did not depend on interpretation of CBA terms); *Krashna v. Oliver Realty, Inc.*, 895 F.2d 111, 114 (3d Cir. 1990) (holding emotional distress claim based on harassment and discharge "clearly outside the scope of the [CBA] and § 301"); *O'Shea v. Detroit News*, 887 F.2d 683, 687 (6th Cir. 1989) (holding claim based on employee's assignment to work undesirable night shift not preempted because employer could have tortiously caused employee emotional distress without violating CBA).

While we acknowledge these conflicting results, we interpret *Lingle* to hold Commodore's outrage claim is not preempted. Defendants point to no specific terms of the CBA which we believe would require interpretation in order to resolve any element of outrage. Under the Marcus test,

outrage is not preempted because it is not based on the CBA, but in a source of legal duty — Washington tort law — independent of that contract. The outrage claim could have been brought under state law without a CBA, and therefore does not fall under section 301. Marcus, 99 Yale L.J. at 223; *see also McCormick*, 934 F.2d at 545-46 (Phillips, J., dissenting).

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

Commodore claims Spencer tortiously interfered in his business relationship with WSH by coming onto the WSH jobsite and taunting him repeatedly. Spencer testified he went to the WSH jobsite to retrieve equipment and his actions in discussing Commodore with the job foreman were privileged.

■ This court has identified five elements necessary to make a claim for tortious interference with contractual relations or business expectancy:

1. The existence of a valid contractual relationship or business expectancy;
2. That defendants had knowledge of that relationship;
3. An intentional interference inducing or causing a breach or termination of the relationship or expectancy;
4. That defendants interfered for an improper purpose or used improper means; and
5. Resultant damages.

*Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 28, 829 P.2d 765 (1992). Once these elements are established, the defendant bears the burden of justifying the interference or showing that the actions were privileged. *Pleas v. Seattle*, 112 Wn.2d 794, 800, 804, 774 P.2d 1158 (1989).

■ Proving the defense of privilege, Spencer claims, requires interpretation of the CBA's provisions pertaining to supervisors' responsibilities and duties. The defendant's claim lacks merit. Defendants have not alleged WSH is a party to the same CBA to which they and Commodore were parties. Given that Commodore is a member of Local 32, he may very well have been governed by a different CBA on the WSH jobsite, but it has neither been entered into the

record nor even alleged to be the same CBA which defendants say applies to all other claims. It does not logically follow, therefore, that Commodore's claim for tortious interference in his business relationship with WSH must be resolved by interpreting the CBA which governed his employment relationship with University. *See NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 284, 32 L. Ed. 2d 61, 92 S. Ct. 1571 (1972) (recognizing a new employer is not bound by substantive provisions of the predecessor's CBA where the successor does not assume or agree to the provisions).

Moreover, if there *is* a CBA governing a relationship among Spencer/University, Commodore, and WSH, it need not be interpreted. In *Dougherty v. Parsec, Inc.*, 872 F.2d 766 (6th Cir. 1989), another case remanded for reconsideration in light of *Lingle* (*see Dougherty v. Parsec, Inc.*, 824 F.2d 1477, *vacated and remanded*, 486 U.S. 1049 (1988)), the Sixth Circuit held a state law claim for tortious interference was not preempted by section 301. William Dougherty claimed one of his employer's clients had requested his discharge in retaliation for filing an OSHA complaint. *Dougherty*, 872 F.2d at 767. The court examined the tortious interference law in Ohio and determined the tort did not require a showing of breach of a contract. *Dougherty*, 872 F.2d at 770. The court concluded because the required elements of the claim did not necessitate inquiry into the CBA, the claim was not preempted under section 301. *Dougherty*, 872 F.2d at 771.

Washington, too, does not require the existence of an enforceable contract or the breach of one to support an action for tortious interference with a business relationship. *Pleas*, 112 Wn.2d at 800. Commodore could have asserted his claim regardless of the existence of a CBA. Under the Marcus test, and, as in *Dougherty*, the required elements of the plaintiff's claim do not necessitate inquiry into a CBA. We hold Commodore's claim for tortious interference is not preempted.

■ Because defendants did not file an answer to Commodore's complaint, we can only speculate as to their anticipated defenses at trial. We reiterate, however, that if those defenses raise federal questions, the state law character of Commodore's claims is not thereby destroyed. *See Bettis v. Oscar Mayer Foods Corp.*, 878 F.2d 192, 197 n.8 (7th Cir. 1989) (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393, 398-99, 96 L. Ed. 2d 318, 107 S. Ct. 2425 (1987)). The resulting preemption would only encourage employers to assert invalid defenses based on the CBA to defeat employees' state law claims. Marcus, 99 Yale L.J. at 226-27. Instead, the trial court should evaluate such defenses under its concurrent jurisdiction to interpret CBA's. *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 506, 7 L. Ed. 2d 483, 82 S. Ct. 519 (1962). The trial judge must apply federal law to interpret the CBA, but after discerning the legitimacy of University's and Spencer's defenses, independent state law standards must be applied to resolve Commodore's state law claims.

For the foregoing reasons, the judgment of the trial court is reversed and the case remanded for resolution of the state law claims.

DORE, C.J., and UTTER, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.

BRACHTENBACH, J. (concurring) — I concur in the result only. I note that the majority opinion refers to and relies upon two "models" as the basis of its analysis. My research shows that the so-called "White" model, White, *Section 301's Preemption of State Law Claims: A Model for Analysis*, 41 Ala. L. Rev. 377, 417, 425-26 (1989-1990), has never been cited by a majority in any case. The "Marcus" model is from a student note. Note, *The Need for a New Approach to Federal Preemption of Union Members' State Law Claims*, 99 Yale L.J. 209, 215 (1989-1990). The Note has been cited

by only one appellate court and two trial courts. *Galvez v. Kuhn*, 933 F.2d 773, 776, 780 (9th Cir. 1991) (citing Note for proposition that federal preemption of state labor law has been a confused area of federal litigation and for idea that employers might try to sidestep state law by injecting invalid defenses); *Singh v. Trustees of Estate of Lunalilo*, 779 F. Supp. 1265, 1268 (D. Hawaii 1991) (actually citing *Galvez'* citation of Note for proposition that area of law is confused); *Smith v. Colgate-Palmolive Co.*, 752 F. Supp. 273, 277 (S.D. Ind. 1990) (citing Note for proposition that *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877 (1988) broadened the preemptive force of section 301 of the Labor-Management Relations Act of 1947), *aff'd*, 943 F.2d 764 (7th Cir. 1991).

Surely there is better authority for a reasoned opinion.

ANDERSEN, J., concurs with BRACHTENBACH, J.