[No. 17077-9-II.    Division Two.    October 16, 1995.]
RONALD J. BRUCE, *Appellant*, v. NORTHWEST METAL PRODUCTS COMPANY, *Respondent*.

*Thomas J. West* and *Thompson, Krilich, LaPorte, Tucci & West*, for appellant.

*Randal L. Gainer*, for respondent.

HOUGHTON, A.C.J. — Ronald J. Bruce appeals from summary judgment dismissing his wrongful discharge action against Northwest Metal Products Company (Northwest), based upon its alleged failure to accommodate his disability, as required by Washington's Law Against Discrimination, RCW Chapter 49.60 (WLAD). He contends that material issues of fact remain regarding (1) the presence of a disability; (2) the failure to accommodate; (3) intentional injury; (4) intentional infliction of emotional distress; and (5) Consumer Protection Act (CPA) violations. We affirm the dismissal of his claims based upon intentional injury and the CPA, but reverse the dismissal of his claim based upon the failure to accommodate a disability and remand for further proceedings.

### FACTS

Bruce worked for Northwest from 1983 until August 1990, working his way up from the lowest job classification, "C," to the highest, "A." He was rated as a "very good" "hard worker" by his immediate supervisor, Leadperson Teresa Brothers, and as a "good employee" who did an "average" job by Northwest's General Foreman, Dale McGuire.

During his employment with Northwest, Bruce injured his back a number of times. He sustained a back injury in 1985 while lifting fireplace grates on the job. He was off work for approximately four months. He reinjured his back in November 1986, while working on a furnace pipe,

and again in June 1987, when he fell while unloading a truck that unexpectedly moved. As a result of these back injuries, Bruce was again incapacitated and off work between September and October 1989. After each of these incidents Bruce at first returned to light duty, and eventually returned to his regular duties.

Bruce continued to have problems with his back, however, into 1990. His neurosurgeon, Dr. N.W. Wohns, initially recommended conservative treatment and placed restrictions on his work. Northwest was informed of these restrictions. Because Bruce's injury did not respond to conservative treatment, Dr. Wohns, and a second consulting physician, eventually recommended surgery for lumbar stenosis and herniated nucleus pulposus (a ruptured disc).

Following a laminectomy on February 27, 1990, Bruce was released to return to work in April 1990, with certain limitations. He was restricted to light duty work, no lifting more than twenty pounds, and no excessive bending, twisting, standing, or sitting for prolonged periods. His "return to work" slip, which Northwest's McGuire acknowledged receiving, specified these limitations. Both Bruce and McGuire told Brothers about Bruce's restrictions.

In response, Brothers testified[1] she told Bruce many times

> to be careful, make sure he didn't do anything [to injure himself]; and [she would] also ask him if the job was going to harm him in any way if he was to do it. And [Bruce would] always say, 'No, I'm fine.'

She put him to work on the medium bandsaw, which allowed him to work within his weight restrictions. Brothers further affirmed that there was sufficient bandsaw work to keep Bruce busy "eight hours a day, five days a week."

---

[1]All testimony referred to herein is by way of deposition.

Nonetheless, after about two and one-half months, she moved Bruce to the duct pipeline. A coworker of Bruce's, Richard Brown, testified this was the most physically demanding job in Bruce's department. Brothers testified that she moved Bruce to the duct line because she needed him to fill in. Bruce testified that another person with lower seniority began training on his bandsaw at this time, but that he did not know why he was removed from there and put on the line.

Brothers also testified that she socialized with Bruce and his wife and that he did not complain about his back. Bruce testified, however, both that they did not socialize and that he told her his back was hurting.

Bruce testified he then experienced back irritation due to the requirements of lifting over twenty pounds, twisting, bending and stretching. This prompted him to complain to Brothers during a break on his second day on the duct line. Bruce's wife, Shirley Bruce, who worked in an adjacent department at Northwest, testified she heard Bruce tell Brothers during this break that his back was hurting and that he did not know how much more he could stand. Richard Brown also confirms the substance of this conversation. Brothers essentially denied that Bruce ever complained to her about his back.

According to Shirley Bruce, however, Brothers said she would see what she could do. Bruce testified he was then called into the office of Claire Couturier, the Vice President of Operations at Northwest. Bruce asserts Couturier said

he understands my back is starting to be irritated and that if I can't do the job I'm on that they would find me a job that I could handle, whether it means bringing me back in wages or being able to handle the job I'm on. I did bring to his attention that it was only two and a half months and that I was real fortunate to be even back at work at that time.

. . .

I brought to his attention that [working on the duct line]

was against my restrictions, and then I went back to . . . [working on the duct line].

Bruce further testified that Couturier did not tell him what other jobs might be available, that he told Couturier he had been "doing fine on the band saw," and that Couturier said "We could have had you retrained," but "figured that [you] could handle the jobs that were there." According to Shirley Bruce, Ronald Bruce inferred Couturier had threatened to "bust[ ] him back" to a lower-paying job if he did not perform on the duct line.

Shirley Bruce testified she was also present when Ronald Bruce told McGuire he was wearing a corset due to the irritation he was experiencing from being on the line. McGuire denies any conversation until just before Bruce left Northwest. Ronald Bruce testified that after the incident with Couturier, he also told Brothers he was wearing a corset due to the pain he was experiencing on the line.

In his deposition, Couturier denied any such conversation. In a subsequent affidavit, however, Couturier says he does not recall speaking with Bruce during this time, though he says such a conversation could have occurred.

August 14, 1990, Bruce saw Dr. Wohns for a follow-up visit. Dr. Wohns' nurse, Joanne Swanson, wrote chart notes stating that Bruce

> continues to have low back pain, stiffness in his low back, and occasional muscle spasms in both legs. These symptoms mostly occur in the evening after he has worked a full day. He states that his job requires him to stand, bend and twist but not to excess. He is careful with this at work. . . .
>
> He has been notified by Labor and Industries that his condition is considered stable and they are closing his claim. He is upset by this and feels that they have rushed him through too quickly . . . we have received no communication from L & I regarding this patient.

This entry also refers Bruce for spine rehabilitation and x-rays.

On or about August 23, 1990, after he had worked on the duct line for approximately seven weeks, Bruce told Brothers he was having "real difficulty" with his back and needed to go home. According to Bruce, he was taken to McGuire's office, Couturier entered, and Bruce told them he had to go home due to his back disability. Bruce went to Dr. Wohns on Friday, August 24, 1990; Dr. Wohns apparently[2] released Bruce to work on Monday the 27th, again with similar restrictions. Bruce did not return to work.

McGuire testified in an affidavit that he attempted to inquire of Dr. Wohns about Bruce's "disability" after Bruce left. The staff at the doctor's office declined to give McGuire any information. This is corroborated by an August 27, 1990 telephone note from Dr. Wohns' office, stating no information was given to McGuire "per p[atient's] request." This request was apparently made by Bruce several months earlier, on May 1, 1990. There is no indication McGuire, or anyone else, ever made further inquiries, nor did Bruce ever file a grievance.

Almost one year later, on August 26, 1991, Northwest sent Bruce a termination notice, pursuant to the collective bargaining agreement (CBA) Northwest maintains with its employees. Article VIII, § 6 of the CBA provides "[e]mployees absent from work due to occupational medical leave shall retain seniority for purpose of recall for twelve (12) months." The notice does not specify grounds for termination.

McGuire's testimony asserts that the sole reason Bruce was terminated was his absence on medical leave for more than twelve months. He states he had a "responsibility" to terminate Bruce under the CBA because after twelve months Bruce lost his seniority and would have to be rehired. According to McGuire, the CBA

has always been interpreted by both [Northwest] manage-

---

[2]Bruce acknowledged seeing a "return to work" slip dated August 24, 1990, but no such slip appears in the record before us.

ment and [employees'] union representatives as terminating an absent worker's seniority for recall purposes when he or she has been on a medical leave for more than 12 months.

After receiving the termination notice, Bruce filed suit, alleging disability discrimination under WLAD, CPA violations, and intentional infliction of both injury and emotional distress. McGuire, Brothers, and Couturier each deny they intended to inflict any injury on Bruce, and they each assert they believed Bruce was working within his restrictions. Bruce does not assert any knowledge of an intent to injure him.

Northwest moved for summary judgment. The trial court granted the motion, finding no facts to support Bruce's case. The trial court found (1) no evidence to support intent to injure; (2) evidence indicating Northwest did accommodate Bruce; (3) no evidence of wrongful termination, because "[t]he termination was in conformance with the [CBA] and it is not ambiguous;" and (4) as a result, no CPA violation. Bruce appeals.

## ANALYSIS

This court reviews summary judgments of dismissal under the same rules the trial court applies. *Morales v. Westinghouse Hanford Co.*, 73 Wn. App. 367, 370, 869 P.2d 120, *review denied*, 124 Wn.2d 1019 (1994). Summary judgment should not be granted unless the pleadings, affidavits, and papers on file, when construed most favorably to the nonmoving party, show both that no genuine issue of material fact exists and also that the moving party is entitled to judgment as a matter of law. *Commodore v. University Mechanical Contractors, Inc.*, 120 Wn.2d 120, 123, 839 P.2d 314 (1992); *Parsons v. St. Joseph's Hosp. & Health Care Ctr.*, 70 Wn. App. 804, 807-08, 856 P.2d 702 (1993); CR 56.

■ Northwest first contends that Bruce's action is preempted by the federal law controlling CBAs. *See* Labor Management Relations Act, 1947, ch. 120, § 301, 61 Stat.

156 (codified at 29 U.S.C. § 185). This contention is without merit. Under Washington law, a disability discrimination claim arises out of statute, the WLAD, and is not preempted by any contractual or CBA requirements or remedies. *Commodore*, 120 Wn.2d at 128-33 (adopting and applying "Marcus model"[3] to analyze preemption of racial discrimination claim; the court holds "non-negotiable state law rights [such as discrimination] . . . that cannot be waived in contract" are "independent of CBA's by definition"); *Reese v. Sears, Roebuck & Co.*, 107 Wn.2d 563, 578, 731 P.2d 497 (1987) ("employees may choose to vindicate their civil rights by immediately filing a civil action under RCW 49.60 or they may wait, pursue a remedy under their [CBA], and if their civil rights remain unenforced, file a civil discrimination action pursuant to RCW 49.60"), *overruled on other grounds by Phillips v. City of Seattle*, 111 Wn.2d 903, 910, 766 P.2d 1099 (1989); *Morales*, 73 Wn. App. at 371-72 ("An action for discrimination pursuant to RCW 49.60 is independent of any remedy provided for in the CBA").

■ Northwest next contends that Bruce was required to exhaust his CBA remedies before filing suit. This argument is likewise without merit. "The policy requiring the exhaustion of CBA remedies prior to proceeding with suit does not apply to RCW 49.60 discrimination cases." *Morales*, 73 Wn. App. at 371 (citing *Reese*, 107 Wn.2d at 577-78; *Commodore*, 120 Wn.2d at 133). Simply put, while Northwest's defenses may concern the CBA, Bruce's complaints of intentional injury and discrimination arise solely out of statute;[4] they thus are not preempted.

■ To resist summary judgment on his disability dis-

---

[3]The "Marcus model" explains that a state law claim, whether negotiable or nonnegotiable, is independent of a CBA, and not preempted, if it can be asserted without reliance on the employment contract. *Commodore*, 120 Wn.2d at 129-30. Furthermore, nonnegotiable state law rights cannot be altered by CBA negotiations. *Commodore*, 120 Wn.2d at 131. Thus, nonnegotiable or independent negotiable claims should not be preempted. *Commodore*, 120 Wn.2d at 131.

[4]The intentional injury claim arises out of RCW 51.24.020, which allows private actions against employers who intentionally injure their employees.

crimination claim, Bruce had to produce some evidence that (1) he was disabled; (2) he was qualified to perform in an available position; and (3) Northwest failed "to take *affirmative* measures to make known suitable job opportunities to [him] and to determine whether he . . . is qualified . . . ." *Curtis v. Security Bank*, 69 Wn. App. 12, 17, 847 P.2d 507, *review denied*, 121 Wn.2d 1031 (1993) (citing *Dean v. Metropolitan Seattle*, 104 Wn.2d 627, 639, 708 P.2d 393 (1985)).

■ Whether Bruce was disabled (i.e., was discriminated against because he possessed an "abnormal" physical condition)[5] is a question of fact, which the trial court could not have resolved once Bruce produced medical evidence of a physical condition, which Bruce did. *Phillips*, 111 Wn.2d at 909-10.

Moreover, Bruce produced evidence that he was qualified to perform in an available position. He had no trouble working on the bandsaw; his supervisor, Brothers, thought he did "very good" work there; and she testified sufficient work existed at that position to keep Bruce busy full-time. Northwest did not dispute his qualifications to perform "A", "B" or "C" level work. This evidence is sufficient to preclude summary judgment on this issue.

■ Finally, Bruce asserts Northwest failed to take affirmative steps to accommodate his disability. Northwest had an affirmative duty to make an effort to accommodate Bruce's disability. *See, e.g., Dean*, 104 Wn.2d at 632-33 (duty to accommodate disabilities); *Holland v. Boeing Co.*, 90 Wn.2d 384, 388-89, 583 P.2d 621 (1978) (employer must take "positive steps" to accommodate); *Curtis*, 69 Wn. App. at 18-19 (same).[6] Although Couturier testified both that he never spoke with Bruce about his condition and also that he did not remember speaking with Bruce, Northwest

[5]*See* WAC 162-22-040(1)(a); *Curtis*, 69 Wn. App. at 16 & n.2.

[6]After oral argument in this case, our supreme court issued a new decision holding that once an employee notifies an employer of a disability, the employer has a duty to take "positive steps" to accommodate the employee's limitations. *Goodman v. Boeing Co.*, 127 Wn.2d 401, 408, 899 P.2d 1265 (1995).

nonetheless relies on Bruce's testimony that Couturier "threatened" to "bust[ ] him back" if he could not handle the duct line as evidence that Northwest accommodated Bruce.

■ Whether Northwest reasonably attempted to accommodate Bruce is a question of fact. *Phillips*, 111 Wn.2d at 910-11. There was evidence that McGuire *believed*[7] Bruce was disabled when he left work because he called the doctor to inquire about the nature of Bruce's "disability." Despite this, there is simply no evidence that Northwest took a single affirmative step thereafter to accommodate Bruce. Thus, there are remaining issues of fact on accommodation and summary judgment of dismissal was not appropriate.

Northwest nonetheless asserts Bruce failed to "cooperate" with it, due to his refusal of its "offer" of other employment. Northwest relies on *Molloy v. City of Bellevue*, 71 Wn. App. 382, 391, 859 P.2d 613 (1993), *review denied*, 123 Wn.2d 1024 (1994), which involved an officer who declined a specific offer of accommodation, a dispatcher position, telling the employer he was planning to move to California. The court concluded the employer had no further duty to attempt to accommodate once the officer declined a suitable offer and expressed an intention to leave. *Molloy*, 71 Wn. App. at 391-92.

Nothing in *Molloy* supports Northwest's position. Northwest would have the trial court view the facts most favorably to it, and presume the conversation occurred as Northwest argues it must have. However, it is a disputed question whether Couturier's alleged comments even constitute an offer of specific employment, much less reasonable accommodation.

Northwest asserts it properly moved Bruce to the duct line in order to train another, lower seniority person on the bandsaw, because the CBA prevented it from moving

---

[7]A person is handicapped if an abnormal physical condition is "perceived to exist, whether or not it exists in fact," under WAC 162-22-040(1)(b)(iii).

the third bandsaw operator, who was Bruce's senior. The difficulty with this argument is that Bruce was senior to the trainee, so Northwest apparently violated the CBA by moving Bruce. Ultimately, however, the issue here is whether Northwest reasonably accommodated Bruce, wherever it moved him. Thus, issues of fact remain and summary judgment was improperly granted.

■ The trial court further dismissed Bruce's RCW 51.24.020 intentional injury claim. The statute provides in pertinent part:

> If injury results . . . from the deliberate intention of . . . [the] employer to produce such injury, the worker . . . shall . . . have cause of action against the employer . . . .

Thus, to resist summary judgment, Bruce had to produce some evidence indicating Northwest deliberately intended to injure his back. *See, e.g., Foster v. Allsop Automatic, Inc.,* 86 Wn.2d 579, 584, 547 P.2d 856 (1976).

Bruce seemingly contends that Northwest's failure to accommodate gives rise to a reasonable inference of intent to injure him. However, there is no intent requirement in a failure to accommodate claim. A jury could not, therefore, reasonably infer intent to injure from the mere failure to accommodate. Bruce has produced no evidence to contradict the testimony of Couturier, McGuire, and Brothers that they had no intention to injure Bruce. Indeed, the case cited by Bruce, *Allsop,* is directly on point and mandates summary judgment on this issue.

Nor was there any evidence produced of intentional or reckless infliction of emotional distress, extreme or outrageous conduct, or resultant extreme emotional distress. *See Wilmot v. Kaiser Aluminum & Chem. Corp.,* 118 Wn.2d 46, 78, 821 P.2d 18 (1991). This claim was also properly dismissed.

Bruce next contends that the failure to accommodate gives rise to a CPA claim. This argument is without merit. In 1993, RCW 49.60.030(3) was amended to read as follows:

> *Except for any unfair practice committed by an employer against an employee or a prospective employee . . .* any unfair practice . . . prohibited by this chapter which is committed in the course of trade or commerce . . . is, for the purpose of applying [the CPA], a matter affecting the public interest, is not reasonable in relation to the development and preservation of business, and is an unfair or deceptive act in trade or commerce.

(Italics ours.) Laws of 1993, ch. 510, § 3.

■ By this amendment the Legislature apparently has attempted to exclude employment disputes under RCW 49.60 from coverage under the CPA. This language only precludes a finding that an employer's violation of this chapter is a *per se* violation, however; arguably, an employee could still attempt to prove the elements of a non-per se violation set forth in *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 787, 719 P.2d 531 (1986), and its progeny. But Bruce produced no evidence below to support a finding that Northwest's acts affected the public interest. In light of the Legislature's failure to expressly include such disputes under the CPA, summary judgment was appropriate.

The dismissal on summary judgment of claims based upon intentional injury and the CPA is affirmed; the dismissal on summary judgment of claims based upon a failure to accommodate a disability is reversed; and the matter is remanded for further proceedings.

BRIDGEWATER and FLEISHER, JJ., concur.

Reconsideration denied December 18, 1995.

Review denied at 129 Wn.2d 1014 (1996).